Emily W. **HUFFSTETTLER**, Plaintiff,

v.

Anthony J. **CELEBREZZE**, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 532.

United States District Court
W. D. Virginia,
Danville Division.
March 29, 1963.

Alfred S. Wyllie, Jr., Danville, Va., for plaintiff.

H. Garnett Scott, Asst. U. S. Atty., Roanoke, Va., for the Secretary of Health, Education and Welfare.

MICHIE, District Judge.

This is an action brought by the plaintiff under § 205(g) of the Social Security Act (42 U.S.C.A. § 405(g)) to review a final decision of the Secretary of Health, Education and Welfare denying the plaintiff disability benefits and the establishment of a period of disability under §§ 216(i) and 223 of the Act (42 U.S.C.A. §§ 416(i) and 423).

■ It is conceded that the plaintiff is now disabled as the term is defined in the Act. But the plaintiff is not entitled to recover merely because she is now disabled. She must show that she became disabled at a time when she met the "coverage" requirements of the Act, i. e., when she last had 20 quarters of coverage under the Act during the 40 quarter period which ended with the quarter in which her disability first occurred. Mrs. Huffstettler last met this coverage requirement at the end of September in 1947. Consequently to be entitled to benefits under the Act she must not only be disabled (which she concededly is) but the disability must have occurred on or before September 30 1947.

■ The hearing examiner concluded that Mrs. Huffstettler's disability occurred after September 30 1947 and denied her any disability benefits. His decision has now become the decision of the Secretary of Health, Education and Welfare and § 205(g) of the Act (42 U.S.C.A. § 405(g)) provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." However, I find in the record ample evidence that the plaintiff was disabled on or before September 30 1947 and I cannot find any substantial evidence supporting the Secretary's finding to the contrary. Consequently the decision of the Secretary must be reversed.

In the first place it is unfortunate that many of the early records concerning the plaintiff's health have been lost or destroyed. From 1941 the plaintiff's physician was Dr. Brown Carpenter who was killed in World War II. Subsequently she was treated by Dr. Willard Arnett, Jr. but his early records were destroyed by Hurricane Donna. The records of Dr. Leonard Jenning appear to have been in some way destroyed. During the early years Mrs. Huffstettler went several times a year to the Community Hospital in Danville but that hospital went out of business and its records were destroyed. Nevertheless there is ample other evidence of plaintiff's condition in those early years.

There is evidence in the record that as far back as 1940 Mrs. Huffstettler had to go to the hospital two or three times a year to take mercury hydrate to expel excess fluid from her tissues. This was caused and continues to be caused by myocardial insufficiency. This is a progressive disease. "Just like any machinery, once it starts to wear out it just doesn't hold up" (Dr. Beaton).

Dr. Arnett in a report dated November 15 1960 says, "My records were ruined by Hurricane Donna and I cannot give a complete picture of all the treatments of Mrs. Huffstettler. She has been unable to work to my knowledge since 1941."

Mrs. Della C. Phillips, a registered nurse, filed an affidavit under date of October 16 1961 to the effect that she had known the plaintiff all her life and that she had "been disabled for the past 20 years and in my opinion, has not been able to work for the past 20 years. I see her often and I know that she is unable to engage in any type of gainful activity because of her physical condition * * * Mrs. Huffstettler has been forced to use a hospital bed at her home since 1946. At the present time she has become a total invalid."

The plaintiff testified that she started having asthma and hypertension in 1941 and was then treated for it by Dr. Carpenter who was killed. She said she also had high blood pressure at the time and was advised to quit work by Dr. Carpenter. A friend, Mrs. Hall, who worked with the plaintiff at Dan River Mills back in the '30's, said that her friends began to notice a change in her as far back as 1937 or 1938. She had difficulty in breathing and began putting "this weight on about that time." "This weight" refers to plaintiff's weight which is estimated to be well over 300 pounds. Apparently they have not been able to find any scales that run high enough to get her exact present weight. A relative of the plaintiff who worked side by side with her at Dan River testified to the change in her ability to work subsequent to 1935 and that she had been physically unable to do even light work since 1943.

Plaintiff herself said she stopped work at Dan River Mills in 1943 because she couldn't work regularly. She was told that she was going to be discharged for this reason and told them that she would quit instead. She couldn't work regularly because she couldn't breathe and couldn't walk about. And when she got to the Mill she had to walk a mile from the gate to get to her place of work.

The plaintiff tried to return to work in 1946 when her husband was in the hospital and they needed some money. She went to work for one day but had to leave at 4 o'clock with asthma so bad that her supervisor carried her home. She did not try to go back again until some 6 years later.

A letter in the file from a Mrs. C. B. Williams stated that Mrs. Huffstettler "tried to work until her health failed her. She is completely disable(d) to work now." To the same effect is a letter from the pastor of Mrs. Huffstettler's church—likewise dating her disability from about 1946.

Dr. E. Forrest Neal wrote a letter for the file to the effect that he had known Mrs. Huffstettler since 1944 and that she had not been able to work at any time since he became acquainted with her.

Dr. Arey wrote a letter to the effect that he had been treating Mrs. Huffstettler since 1947 and that since he had known her "her physical condition has been such that she was not able to work".

Dr. Beaton testified that as far as he could ascertain from the records Mrs. Huffstettler had been pretty much the same for "the past 10, probably 15 years" and that in his opinion she would not be able to do any work. "The slightest exercise brings on what we call dyspnea, shortness of breath, and reduces her cardiac asthma which makes her breathing, its almost impossible for her to get around like, say, well a normal individual." He also testified about giving Mrs. Huffstettler mercury hydrate to "expel or excrete this excess fluid which she evidently has in her body, not only in the most dependent parts of her feet but in her arms and abdomen and all over her body."

A Mrs. Doris Bray, a legal secretary, testified that she had known Mrs. Huffstettler all her life and that during her early working years at Dan River she didn't "really consider her able to work much at that time but she attempted to work even though she had to be out on account of sickness a lot, in the hospital a lot." She also testified with respect to the plaintiff's attempt to work one day in 1946 and her actual work for three months with Dan River in 1951 and gave her opinion that Mrs. Huffstettler was unable to do even light work—"even the

exertion of getting to and from work * * * I just don't think she could do it."

Mr. Bray also testified that the plaintiff had been continuously disabled even for light work since 1947. Mrs. Huffstettler's sister-in-law, Beatrice, testified that she had been unable to do any work since 1947 and stated, in answer to an inquiry whether she had tried, "I think she has tried as hard as anybody". Plaintiff's husband testified that she "hasn't been able to, gosh, she hasn't been able to do anything in 15 years, working I mean. She tried. She is not able to work."

As indicated above Mrs. Huffstettler tried again to work during the strike at the Dan River Mills in 1951. She testified that she wasn't able to work and "they laid me off."

Back as early as 1941 Mrs. Huffstettler had to go to the hospital frequently. Asked how many times a year she averaged from 1943 on she said, "One time I went seven times * * * for four or five years it would be three or four times a year * * * for three days at least and sometimes longer."

As stated above Mrs. Huffstettler stated that she tried to work during the strike of 1951. Her supervisor at the time testified with respect to that period as follows:

"Q. And why did she leave?

"A. Well, actually Mae was laid off because she failed to make production. Mae wasn't physically able to make production. She worked regularly while she was there, but she would have to go home at nights. A lot of nights during the course of the shift she would have to go out.

"Q. You mean during, after she'd come to work?

"A. That's right, after she'd come to work. She was just physically unable to stay there. Mae came to work for us by company request during our last strike we had here. They were hiring help anywhere we could get it, anybody that had experience to produce the work required to do.

"Q. That was to replace the strikers?

"A. That's right. The people that were out. And Mae came in and worked for us and did a good job what she was able to do. She was just absolutely unable to do her work.

* * * * * *

"Q. Well, would you say after she couldn't keep up production, was she able to work?

"A. She was able to work a little, very little. Mae was more or less trying to do the company a favor. The company had been good to her. She had I believe continuous seniority at Dan River from 1930 to '43. Her record was good, and when we were in a tight place there during the strike and had production orders to fill, well, they called and asked Mae to come back and she did. She came back and tried to work but she was unable to hold up production that was required of her at that particular time."

Again Mrs. Bolling, a supervisor for Dan River Mills, testified that she had known Mrs. Huffstettler all her life and, in fact, Mrs. Bolling's mother and father had raised Mrs. Huffstettler. She testified in part as follows:

"Q. Has Mae ever been a lazy person?

"A. No indeed.

"Q. Has she tried to work?

"A. She has.

"Q. Is she able to do any kind of light work?

"A. No.

"Q. Has she been able to do any kind of light work since 1947?

"A. No."

Similarly a next-door neighbor, Mrs. Annie K. Hall, testified as follows:

"Q. Are you familiar with her condition as to whether she has been able to work since 1947?

"A. No, she hasn't. She may have tried. She wants to work, no doubt about that because she is not lazy. She has never been a lazy person.

"Q. You say she has been disabled to work. Do you know what has been wrong with her?

"A. Well, I know when she would visit me during the summer months before she was married, after I moved to the country, we, at that time, of course, had to bring the water. She couldn't bring the water from the spring. I'd take the buckets on because she had difficulty in breathing.

"Q. Do you know of anything that Mrs. Huffstettler may be able to do in the way of light work or to earn a living?

"A. Well, as you heard Mr. Huffstettler say, every bath that she has he bathes her. I think that any person who is not able to take her own bath is certainly not able to do anything.

 \*  \*  \*  \*  \*  \*

"Q. And then in 1946 she worked one day at Dan River Mills?

"A. Uh, huh.

"Q. And do you know what was wrong with her, the reason that she didn't work for more than one day?

"A. Well, along about that time she was having difficulty with, just, she was having real bad severe attacks of asthma at that time. We thought it was asthma but probably now since this heart condition developed, it could have been that all the time. She was in and out of the hospital. By that time she had gained so much weight that they couldn't feed her, they couldn't get her veins, they couldn't find her veins, and lots of times they would have to feed her, do her injections by mouth which would cause long periods of sickness, where maybe it could have been healed quicker if they could have gotten in the blood stream.

"Q. Where was she going, was she going to the hospital much?

"A. Yes.

"Q. Where was she going?

"A. Along about that time she was at the Community Hospital for, until they closed out, which I think was about '49 or '50 when they closed. But from about '40 to '49 most of Mae's admittances were at the Community.

"Q. Do you know how many times a year she would average going to the Community Hospital?

"A. I'd say four or five."

■■ The hearing examiner in his opinion and the government in its brief relied to a considerable extent on the absence of the medical records for the early years of Mrs. Huffstettler's illness. In fact the hearing examiner quoted from the definition of "disability" found in the Act: "inability to engage in any substantial gainful activity by reason of any *medically determinable* physical or mental impairment \* \* \*" (emphasis supplied) and took the position that Mrs. Huffstettler's disability in the early days is not "medically determinable" because the medical records have been lost. Of course the definition means no such thing. "Medically determinable" as used in the definition obviously means a disability of a type that can be determined by medical processes.

The fact that the early determinations made at the onset of the disability have been destroyed by act of God does not alter the fact that her disability is of a medically determinable nature.

The hearing examiner also relies strongly on the fact that Mrs. Huffstettler did try to work for a few months in 1951 but all that that effort shows is that she was willing to try but unable to make the grade—as demonstrated by the testimony quoted above.

The defendant also argues that the report of a stay of the plaintiff at the National Institute of Health at Bethesda, Maryland from November 1954 to March 1955 showed that "her obesity was a remedial condition". The report does show that she lost a relatively small amount of weight under treatment at Bethesda over a period of approximately four months. I do not think that proves that under ordinary conditions her obesity was remedial to the point where she would be able to work.

The final decision of the Secretary of Health, Education and Welfare will be reversed.